# In the United States Court of Federal Claims

No. 23-1569L

(Filed: September 30, 2024)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

KEVIN ALLARD, et al.,

      *Plaintiffs*,

v.

THE UNITED STATES,

      *Defendant*.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

    *Stephan J. Hill*, San Diego, CA, with whom were *Gerald Singelton* and *Susan B. Dussault*, for plaintiffs.

    *Ashely M. Carter*, Trial Attorney, United States Department of Justice, Environmental and Natural Resources Division, Washington, DC, with whom were *Todd Kim*, Assistant Attorney General, and *Alexa Penalosa*, Trial Attorney, for defendant.

## OPINION

BRUGGINK, *Senior Judge*

    The Holiday Farm Fire, which began on September 7, 2020, burned over 170,000 acres in Oregon, took the life of one person, and resulted in millions of dollars in damage to buildings. In this lawsuit, plaintiffs, landowners whose property was affected by the fire, assert that the United States, acting through the Bonneville Power Administration ("BPA"), owes them compensation for taking their property within the meaning of the Takings Clause of the Fifth Amendment. The United States moved to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), or, alternatively, pursuant to Rule 12(b)(6) for failure to state a claim. The matter is fully briefed, and oral argument was heard on August 22, 2024. Because plaintiffs' complaint, on its face, alleges government action, taken

for public benefit, resulting in an invasion that was the direct, natural, and probable result of that government action, the motion must be denied.

BACKGROUND[1]

Plaintiffs are individuals, or their representatives, along with several companies, all of whom hold property interests, both fee and leasehold, in Lane County, Oregon.  The BPA is an administration within the United States Department of Energy. *See* 16 U.S.C. § 832(a). It is authorized to construct dams on the Columbia River, with the purpose, among others, of providing electricity to the Pacific Northwest.  In accomplishing that end, it is authorized to acquire by lease, purchase or condemnation, access routes for electric transmission lines.  *Id*.  Plaintiffs own land adjacent to or in proximity to these transmission lines.

The complaint alleges that, due to drought conditions throughout 2020, fire potential in the areas within Oregon served by the BPA was well above normal levels at the beginning of September 2020.  Starting on Wednesday, September 2, the National Weather Service ("NWS") began issuing warnings about dangerous weather conditions for fires.  It cautioned that beginning on September 7, 2020, there would be gusty offshore winds, perhaps winds only seen every thirty years.  The NWS issued a "Red Flag Warning" that would begin on September 7 and end the next day because winds up to 50 miles per hour were anticipated.  Such warnings are issued when anticipated high winds combine with low humidity and high temperatures to create a high risk of fire.  By the morning of the 7th, the NWS warned that wind speeds might reach 60 to 80 miles per hour, putting Oregon in the "Extremely Critical" category, reserved to situations in which forecasters are confident that extremely dangerous wildfire conditions exist.  Before September 2020, the last time NWS had placed Oregon in that category was 2000.

On September 7, the Office of the Governor of Oregon convened a conference call with several utilities, including the BPA, advising them to immediately cease running electricity through lines in the affected areas. Utility operators in Oregon other than BPA elected to cease energizing their lines.  Plaintiffs allege that the BPA continued to send power down certain lines in the Holiday Farms area even after high winds in that area were

---

[1] The facts are taken from the complaint and assumed to be true for purposes of ruling on the motion.

reported.  At 5:25 p.m., a fault occurred in the lines in that same area, causing transmission to halt.  The fault was caused by a downed tree on the lines, which, according to the complaint, ignited a fire.  Nonetheless, the BPA reenergized those lines and continued transmitting electricity through the corridor in question (near milepost 42 of Highway 126).  A second fire began around 8:00 p.m. that evening five miles away (near milepost 47).

The fires quickly spread to the greater Holiday Farms area, destroying the vegetation and improvements on over 170,000 acres of land.  Plaintiffs allege that they have been deprived of the enjoyment of their property, real and personal, ever since.  They filed suit here on September 12, 2023, seeking compensation under the Fifth Amendment's Takings Clause.  They later brought suit in the United States District Court for the District of Oregon on February 14, 2024, seeking damages pursuant to the Tort Claims Act for the same events.

In its motion to dismiss for lack of jurisdiction, the government argues that the claim, as pled, describes a tort, rather than a taking.  Although the court has jurisdiction over Fifth Amendment taking claims, it does not have jurisdiction over tort claims. 28 U.S.C. § 1491(a)(1) (excluding claims "sounding in tort").  With respect to its alternative 12(b)(6) motion, defendant asks the court to dismiss for failure to state a claim because the complaint alleges inaction on the part of the BPA, an assertion defendant believes is incompatible with a takings claim.

DISCUSSION

When considering a motion to dismiss under Rule 12, we assume the well-pled facts to be true, unless, in the context of a jurisdictional issue, they are challenged.  *Ainslie v. United States*, 355 F.3d 1371, 1373 (Fed. Cir. 2004).  Here, defendant's motion is aimed at the sufficiency of the pleadings, not their veracity.

Finding solid ground from which to test the viability of a takings claim can be a challenge.  As the Federal Circuit observed in *Yuba Goldfields, Inc. v. United States*, the law of just compensation is hardly a model of clarity. 723 F.2d 884, 887 (Fed. Cir. 1983).  Instead, it is characterized by "confusing and incompatible results, often explained in conclusionary terminology, circular reasoning, and empty rhetoric." *Id.* (quoting Van Alstyne, *Taking or*

*Damaging by Police Power: The Search for Inverse Condemnation Criteria*, 44 S. CAL. L. REV. 1, 2 (1970)).

In addition, applying the results from a line of cases involving one type of government action may not be fully transferable to other contexts. For example, flooding cases are arguably *sui generis*. *See Banks v. United States*, 138 Fed. Cl. 141, 147 (2018) (noting that flooding cases present considerations that are often unique in the realm of takings law). Direct physical invasions are a particular species as well. Fortunately, we are not dealing here with an asserted regulatory taking.

Taking by fire turns out also to be less than clearly crystalized. The government has not argued that unintentional destruction resulting from the spread of fire on private property can never be characterized as an invasion for takings analysis purposes. Indeed, this court has declined in two recent cases to dismiss claims of invasion by fire brought by landowners. In *McDonough Family Land, LP v. United States*, the Forest Service entered onto plaintiffs' property to set fires to consume flammable material and thereby reduce the risk of uncontrolled fires. 172 Fed. Cl. 414, 423 (2024). "[T]here can be no dispute that the government intended to invade the Ranches' property interests when IMT firefighters, acting under the direction of a Forest Service employee, deliberately set their timber and range forage on fire." *Id.* Similarly, in *Rancho de Dias Alegres, LLC v. United States*, a motion to dismiss was denied in the face of an allegation that the Forest Service should have known that setting backfires on nearby land could result in spread of fire to plaintiffs' property. 168 Fed. Cl. 139, 141–43, 147 (2023). "USFS's knowledge of the prevailing weather conditions should have forewarned the government that continuing with the prescribed fire could foreseeably result in damage to the ranches." *Id.* at 146. *But see Johnson v. United States*, No. 22-584L, 2023 WL 1428603, at *2 (Fed. Cl. 2023).[2]

---

[2] In *Johnson*, plaintiffs alleged that the Forest Service's past practice of not taking affirmative steps to reduce fire hazard by preemptively setting fires to consume fuel resulted in damage to their land when a naturally occurring wildfire came onto their property. *Johnson*, 2023 WL 1428603, at *2. The fire, in other words, resulted from inaction. The court dismissed: "Simply

Ironically, intentionally setting fire on a private individual's property, if done as an exercise of the police power, has been held not to be a taking and instead is viewed as a non-compensable exercise of the police power. *See Lucas v. S.C. Coastal Council,* 505 U.S. 1003, 1029 (1992); *Bowditch v. City of Boston*, 101 U.S. 16, 18 (1879); *TrinCo Inv. Co. v. United States*, 722 F.3d 1375, 1378 (Fed. Cir. 2013); *Chapman v. United States*, 107 Fed. Cl. 47, 50 (2012).

The parties appear to agree that the controlling inquiry is set out in a series of three Federal Circuit opinions, one of which concerned an alleged taking by fire. The first is *Ridge Line, Inc. v. United States*. 346 F.3d 1347 (2003). The destructive force there, however, was water. The question was whether the Postal Service had imposed a flowage easement on a down-gradient landowner. *See id.* at 1350. Construction of a Postal Service facility had resulted in regular, increased, and destructive water flow across plaintiff's downhill property. *Id.* at 1351. In reversing the trial court's conclusion that there had been no taking, the court emphasized that a permanent occupation need not exclude owners from the property to be compensable as a taking, nor need the occupation be continuous:

> The line distinguishing potential physical takings from possible torts is drawn by a two-part inquiry. First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, the invasion must appropriate a benefit to the government at the expense of the owner, or at least preempt the owner's right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value.

---

labeling inaction as an affirmative act does not save an otherwise deficient takings claim." *Id.* at *7.

*Id.* at 1355–56 (citations omitted).  From this emerge two elements necessary to allege a physical taking:

1. Either an intent to take property, or the alleged taking was the direct, natural, or probable result of an authorized government action, and;
2. The result must be the appropriation of a benefit to the government at the owners' expense, or at least a preemption of the owners' right to enjoy their property for an extended period of time.

We note that both these elements offer alternative means of being satisfied.

I. Foreseeability And Causation

We reserve the second element of a taking, benefit to the government, for discussion below.  We begin with the first.  Plaintiffs do not allege that the fire was intended.  Instead, they allege that it was the "direct, natural, or probable result" of government action, namely, running electricity through the transmission lines.  Determining whether that allegation is sufficient requires a more careful exploration of the cases relied on by the parties.

The particular inquiry in *Ridge Line* was whether the increased storm runoff was the direct, natural, or probable result of the Postal Service development, "rather than merely an incidental or consequential injury, perhaps compensable as a tort, caused, for example, by improvident conduct on the part of the government in managing its property." *Id.* at 1356.  The Federal Circuit framed the question as follows: "The tort-taking inquiry . . . requires consideration of whether the effects Ridge Line experienced were the predictable result of the government's action . . . ." *Id.* at 1355.  It also adopted the language from *Sanguenetti v. United States*, 264 U.S. 146, 149-50 (1924), that direct or necessary embraces the idea of "within the contemplation of or reasonably to be anticipated." *Id.* at 1356.

The next Federal Circuit opinion the parties rely on is *Moden v. United States*. 404 F.3d 1335 (Fed. Cir. 2005).  There, summary judgment in favor of the United States was appropriate because plaintiffs only alleged that there was a causal link between activities on a nearby Air Force Base and contamination migrating into the groundwater beneath plaintiffs' ranch. *Id.*

at 1338–39.  They were unable to establish that the contamination was the direct or predictable result of government action.  "This evidence does not create a genuine issue of material fact because [plaintiffs] can show, at most, that a government act was the cause-in-fact of the claimed injury, not that the injury was predictable from the act." *Id.* at 1345.  The court further explained that an "injury may not be foreseeable if an intervening cause breaks the chain of causation." *Id.* at 1344.

*Moden* was followed and further explained in *Cary v. United States*. 552 F.3d 1373 (Fed. Cir. 2009).  In that case, landowners in California alleged that the actions of the Forest Service resulted in a catastrophic wildfire that burned over 200,000 acres and claimed multiple lives.  *Id.* at 1375.  The fire started when a lost hunter set a signal fire, which spread rapidly, resulting in the massive losses.  *Id.*  Plaintiffs' assertion was that the Service had, in the past, adopted a practice of quickly extinguishing small wildfires rather than letting them burn, thereby causing the accumulation of tinder.  *Id.*  at 1377.  They also cited the Service's policy of allowing visitors "to enter the forest for recreational purposes." *Id.*  The fire, they alleged, was the "direct, natural, probable result of these policies." *Id.*

Both the Court of Federal Claims and the Federal Circuit rejected that analysis as a potential source of liability.  In its opinion, the Federal Circuit explained that a distinction laid out in *Moden* was relevant:

> *Moden* clarified the meaning of "direct, natural, or probable result" to mean that the injury must be the likely result of the act, not that the act was the likely cause of the injury, the latter allowing for incidental injuries resulting from a true cause-in-fact to be considered a taking. . . . Therefore, to survive judgment on the pleadings, the landowners must plausibly show that the consumption of their property by fire was the likely, foreseeable result of Forest Service action.

*Id.* at 1377.

*Cary* goes on to distinguish direct from consequential results this way: "[W]hen no intervening cause breaks the chain of causation, we have found a taking. . . .  For an injury to be a compensable taking, the court must

7

determine that no break in the chain of causation existed between the suspected government authorized action and the injury." *Id.* at 1379. The court held that a hunter setting the fire was an intervening cause that prevented there being a direct chain of causation between the Forest Service's policies and the fire. *Id.*[3]

Causation and foreseeability are both required, in other words. The mere fact that a direct line of causation can be traced does not eliminate the need to at least allege that the effect was "direct, natural, or probable." Rather, viewing things at the time of the challenged action and from the standpoint of the government as actor, was the fire the direct, natural, or probable result of electrifying the lines?

*Cary* and other cases also have made clear that the requirement of "directness" is not satisfied if the alleged result comes from government inaction, or a policy of *not* doing something. In *Saint Bernard Parish Government v. United States*, for example, plaintiffs alleged that flooding

---

[3] In *Cary*, the court concluded that:

> [A]s the landowners implied in their pleadings, for an injury resulting from the policy of suppressing fires in the CNF to occur, something had to ignite the fire. While the landowners pleaded that the government took the risk of a hunter or other recreational user starting a fire in the forest with its policy of welcoming such users, an actual ignition, not a risk, is what set the wildfire in the CNF. The hunter setting the fire was an intervening cause which broke any perceived chain of causation between the Forest Service's policies and the Cedar Fire.

552 F.3d at 1378–79.

*Cary* adds that "taking a calculated risk, or even increasing a risk of a detrimental result, does not equate to making the detrimental result direct, natural, or probable." *Id.* at 1378. It is less than clear how this admonition applies in determining whether an outcome was "reasonably to be anticipated." *Ridge Line*, 346 F.3d at 1356.

resulted from poor maintenance of levies.  887 F.3d 1354, 1357 (Fed. Cir. 2018).  The court rejected that as a basis for a taking: "While the theory that the government failed to maintain or modify a government-constructed project may state a tort claim, it does not state a takings claim." *Id.* at 1360. Rather, "[a] property loss compensable as a taking only results when the asserted invasion is the direct, natural, or probable result of authorized government action."  *Id.*  The government is not liable under the Fifth Amendment's Takings Clause for a failure to act.  *Id.*

Our attempt at synthesizing these elements leads to the following formula: if, at the time the government action was taken, all the elements of causation that lead to the eventual result should have been assumed to immediately and logically follow, then the injury resulted directly from government action.  If, on the other hand, the ultimate loss required the interposition of an event that could not be assumed to naturally follow from the initial action, then that later event breaks the chain of causation.

To put this in the context of the complaint, plaintiffs must allege plausibly that it should have been apparent to an objective observer, knowledgeable of the facts and circumstances, that BPA's decision to maintain the electricity or, later to turn it back on, would have been tantamount to deciding to start a fire.[4]  The following paragraphs from the amended complaint are plaintiffs' effort to fit within the necessary rubric:

19.  The direct, natural, and probable result of BPA's intentional conduct—including continuing to energize and/or to reenergize powerlines it owned, operated, or controlled when there was extreme wildfire danger—was the ignition of the Holiday Farm Fire. The fire initially ignited at 5:25 p.m., on September 7, 2020, when *a tree, that BPA should have removed*, toppled onto its powerline near milepost 42 of Highway 126, causing a fault. A second ignition occurred later

---

[4] *See generally Hansen v. United States*, 65 Fed. Cl. 76 (2005) for an exposition on the development of foreseeability as a proxy for specific intent in takings law.  Takings law borrows from the broader field of torts to impose liability for the direct consequences of government action, even when not specifically intended.

that evening at about 8:00 p.m., near mile 47 of Highway 126 after BPA reenergized its powerline following the fault, thereby transmitting power to LEC's powerline at that location, despite the extreme fire danger. At the time that BPA reenergized its powerline wind gusts exceeded 60 miles per hour, with sustained winds of about 40 miles per hour, and humidity was near 10%.

20. The inevitable consequence of BPA's continued transmission of electricity, given the conditions (including wind speed and direction, topography, and the predictable way in which wildfires spread), was a wildfire that spread to Plaintiffs' properties and deprived Plaintiffs of use and enjoyment of their properties for a significant period of time, many of them permanently, as some properties will never recover and others will require months, if not years, to be rebuilt and restored.

Am. Compl. ¶¶ 19–20 (emphasis supplied).

In sum, plaintiffs allege that the BPA should have foreseen that, because of the high winds and low humidity, turning or leaving on the electricity would directly lead to the ignition. The possibility or indeed likelihood that trees would fall onto the electrical lines, in other words, was readily foreseeable under the circumstances, at least according to the complaint.

Defendant responds, however, relying on the italicized language in paragraph 19, that plaintiffs themselves have alleged government inaction as the cause and an intervening cause that breaks the chain of causation/foreseeability, namely, that it was the BPA's negligent right-of-way maintenance which caused the tree to fall onto the lines. Defendant also pounces on language in plaintiffs' response to the motion to dismiss in which they assert that it was the BPA's "inadequate vegetation maintenance [that] caused that tree to fall." Pls.' Resp. 6 n.3. In other words, according to defendant, plaintiffs' real complaint is that BPA negligently maintained its transmission corridor. Citing *Cary*, defendant argues that the foreseeable result of maintaining power, or reenergizing the lines was, at most, merely a

heightened risk of fire due to an unrelated phenomenon—poor line maintenance. And, because the fallen tree was outside of the government's control, i.e. an intervening cause, the casual chain is broken, argues the defense.

As reflected in the cases discussed above, defendant is correct that inaction does not constitute affirmative action for purposes of assessing the sufficiency of takings pleadings. *See Bd. of Supervisors of Issaquena Cnty. v. United States*, 84 F.4th 1359, 1365–66 (Fed. Cir. 2023) (flooding resulting from failure to install sufficient pumps not a taking); *Bench Creek Ranch, LLC v. United States*, 855 F. App'x. 726, 728 (Fed. Cir. 2021) (failure by the Bureau of Land Management to control the wild horse population could not state a taking claim).

Putting these two ideas together—the presence of an intervening cause (negligent maintenance of the right of way), and the fact that the intervening cause, even if traceable to the United States, is grounded in inaction—defendant concludes that plaintiffs have scuttled their own case. *Thune v. United States* lends support:

> This line of reasoning is well founded. The complaint states that plaintiff's hunting camp was not within the intended burn area, indicating that its destruction was not a natural consequence of the Dry Cottonwood fire as designed. Complaint ¶ 9. Instead, plaintiff alleges that the destruction occurred because the USFS "failed to maintain and control the Dry Cottonwood fire" and because the USFS was "negligent." Id. ¶¶ 9, 11. These allegations, even if true, do not give rise to a taking. A claim for damages resulting from the government's faulty, negligent or improper implementation of an authorized project sounds in tort.

41 Fed. Cl. 49, 52 (1998).

We disagree with defendant's invocation of *Thune* and similar cases, however. In *Saint Bernard Parish,* the inaction or negligence plaintiffs relied on was the asserted basis for the claim of liability. There was no other government action alleged. The same is true with respect to the asserted

government action in *Thune* and *Johnson*. Here, on the contrary, the asserted negligence of the government in maintaining the power line right of way is merely part of the existing factual background against which the action of running electricity takes place. This is easily seen if the responsibility for maintaining the right of way did not fall on the government but on a third party. If, at the time the government decided to run electricity, negligence by that third party was known, then it could not be an intervening, unforeseeable cause. The result should be the same here. The mere fact that the asserted pre-existing negligence could be traced to the government is immaterial. The decision being tested by the taking assertion is whether the BPA should have foreseen that the direct, logical result of energizing the lines would be combustion.[5] For the same reason, the fact that the third-party negligence constitutes inaction—the failure to maintain the corridor—is therefore also irrelevant to the taking analysis.

Further, even if plaintiffs' theory of causation involves the fallen tree, and even if that proves to be an interruption between the government action and the fire—a conclusion we are unwilling to make without some development of the factual record—a second ignition is alleged that is causally unconnected to that tree; it was five miles away and later in time. Thus, the chain of events alleged by plaintiff connecting defendant's actions to the fire are not entirely dependent on the particular downed tree.

Whether plaintiffs can prove their allegations is not currently before us. We are satisfied that they have alleged sufficient grounds for prong one of the takings inquiry. We are mindful as well of the admonition in *Yuba Goldfields* that takings claims are uniquely fact dependent. 723 F.2d at 887 ("The fact-intensive nature of just compensation jurisprudence to date, however disorienting in other contexts, argues against precipitous grants of summary judgment.")

---

[5] For example, if the government knew, prior to reenergizing the lines, that a tanker loaded with gasoline had run into a transmission pylon and spilled its contents, and that turning on the electricity would probably ignite the gasoline, the wrecked gasoline truck is not an intervening cause. If, on the other hand, the tanker accident occurred after the agency elected to energize the lines, then it likely would be an intervening cause of a resulting fire.

II. Nature Of The Government Action

The second prong was explained in *Cary*: "[A]n invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners' right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." 552 F.3d at 380. As to a public benefit, plaintiffs contend that maintaining active electric service is a benefit to the public, and that as a consequence of securing that benefit, three years later plaintiffs' land has not recovered and that they have been permanently deprived of real and personal property.[6] We find this to be sufficient at the present stage of pleadings.

CONCLUSION

Plaintiffs have sufficiently pleaded the elements of a compensable taking. Defendant's motion to dismiss is therefore denied.[7]

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge

---

[6] This distinguishes the present allegations from *Cary*, where the court noted that "the fire has come and gone, and there is no allegation that the injuries prevent future use of the land, or that the fire will intermittently but inevitably recur. To satisfy the appropriation requirement, the preemption must be sufficiently permanent that it can be said that the government has exercised dominion over the property." 552 F.3d at 1381.

[7] We also decline defendant's invitation to broaden the effects of 28 U.S.C. § 1500. "The long established rule of comity in such cases is that the court having equal and concurrent jurisdiction over the subject matter which first obtains and exercises this jurisdiction, retains jurisdiction until a final judgment is entered." *Tecon Engineers, Inc. v. United States,* 343 F.2d 943, 946 (Ct. Cl. 1965).